ROGERS, TATEL, and PILLARD Circuit Judges,
dissenting:
When confronted with the facts of this case, one is tempted to search for a way to sustain Ali Hamza Ahmad Suliman al Bah-lul’s conviction for the crime of inchoate conspiracy to violate the laws of war. After all, he has admitted that he swore an oath of loyalty to Osama bin Laden, served as bin Laden’s personal secretary, and made al Qaeda recruitment videos. But tempting as it may be, too much is at stake to affirm. The prosecution of al Bahlul in a law-of-war military commission for inchoate conspiracy infringes the judiciary’s power to preside over the trial of all crimes, as set forth in Article III of the Constitution. History and precedent have established a narrow, atextual exception to Article III under which the military may try enemy belligerents for offenses against *805 the international “laws of war,” but inchoate conspiracy is not such an offense.
The challenges of the war on terror do not necessitate truncating the judicial power to make room for á new constitutional order. “The laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty arid security can be reconciled; and in our system they are reconciled within the framework of the law.” Boumediene v. Bush, 553 U.S. 723, 798, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). The exceptional authority the government seeks here falls outside the bounds established by more than a century of constitutional practice. Equally important, the government here has never contended that such authority is even necessary. The prosecution could have charged al Bahlul with recognized war crimes using conspiracy as a theory of liability or it could have charged him before an Article III court with inchoate conspiracy and any number of other crimes triable there but it chose neither course. The circumstances of this case thus present no occasion for the judicial branch to abandon its responsibility to enforce the constitutional plan of separated powers.
Accordingly, for the reasons set forth below, we respectfully dissent from the judgment affirming al Bahlul’s conviction. We begin in Part I with the standard of review, concluding—along with the majority of this court—that al Bahlul’s' separation-of-powers claim is properly reviewed de novo. In Part II we set forth the relevant precedent governing that claim, explaining that it fails to provide support for the government’s prosecution of al Bahlul in a military commission for the crime of inchoate conspiracy. We also respond to the government’s key arguments for upholding al Bahlul’s conspiracy conviction, finding none persuasive. Part III then responds to several of our colleagues’ arguments, and Part IV addresses the potential consequences of the government’s asserted authority. We conclude by emphasizing that, in keeping with our Constitution’s commitment to judicial independence, a majority of this court declines to cede the requested judicial authority to the military.
I.
As a threshold matter, the government argues that during the military commission proceedings, al Bahlul failed to raise each of the challenges he now advances against his conspiracy conviction and that he has,'therefore, forfeited them. Resp’t’s Br. 17-18;. see Millett Op. at 778-80. If al Bahlul did forfeit them, this court would ordinarily review those claims only for plain error—a highly deferential standard. See Al Bahlul v. United States (Al Bahlul I), 767 F.3d 1, 9-10 (D.C. Cir. 2014) (en banc). The challenge we address, however, asks whether trying al Bahlul for the crime of inchoate conspiracy in a law-of-war military commission violates the separation-of-powers principles enshrined in Article III, §' 1 of the Constitution. That question warrants de novo review.
As this court has recognized, a party can waive or forfeit the argument that an opposing party has waived or forfeited a claim. See, e.g., Solomon v. Vilsack, 763 F.3d 1, 13 (D.C. Cir. 2014) (“By failing to argue forfeiture or a failure to properly plead the claims before the district court, the Secretary has—in a. word—forfeited his forfeiture argument here.”); United States v. Delgado-Garcia, 374 F.3d 1337, 1340 (D.C. Cir. 2004) (holding that, by failing to advance it, the government had “waived its waiver argument”). Here, the government has undoubtedly forfeited any argument it -might have had that al Bahlul failed to pursue (and thereby forfeited) his “structural” Article III claim. In its first en banc brief to this court, the government forcefully argued that al Bahlul had for *806 feited his ex post facto challenge by failing to raise it at trial and that the challenge was consequently subject to plain error review. Brief for the United States 63, Al Bahlul I, 767 F.3d 1, No. 11-1324, 2013 WL 3479237, at *63. But the government never suggested that al Bahlul had similarly forfeited his Article III objection or that this court should review that claim only for plain error. Id. at 70-71, That was so even though al Bahlul had expressly sought de novo review of that claim. See Brief for Petitioner 13, Al Bahlul I, 767 F.3d 1, No. 11-1324, 2013 WL 2325912, at *13. Later, on remand to the original panel, the government again failed to argue that al Bah-lul had forfeited his structural Article III claim. Instead, it expressed its belief that the claim was nonforfeitable and thus subject to de novo review. See Transcript of Oral Argument at 29-30, Al Bahlul v. United States (Al Bahlul II), 792 F.3d 1 (D.C. Cir. 2015) (No. 11-1324) (“Q: Are you also saying that the structural Article 3 claim is forfeitable? A: I. am saying that argument is not forfeitable.”). Now, after four years of litigation before this court, the government changes its tune and, for the very first time, argues that al Bahlul forfeited the structural claim at trial. Because the government long ago “forfeited [its] forfeiture argument” with respect to that claim, Solomon, 763 F.3d at 13, this court properly reviews it de novo. See Ka-vanaugh Op. at 760 n.l.
Even if the government had, from the outset, pressed its view that al Bahlul forfeited his structural Article III claim, we would still review it de novo. The Supreme Court has made clear that ordinary forfeiture and waiver principles do not apply to structural Article III claims like this one. As the Court has explained, Article III, § 1, which vests “[t]he judicial Power of the United States, ... in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish,” serves two distinct purposes. First, it “safeguard^] litigants’ right to have claims decided before judges who are free from potential domination by other branches of government.” Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 848, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (internal quotation marks omitted). Second, it “protect[s] the role of the independent judiciary within the constitutional scheme of tripartite government.” Id. (internal quotation- marks omitted). As with other constitutional rights, litigants can waive or forfeit their personal right to an Article III adjudication. See id. at 848-49, 106 S.Ct. 3245; Wellness International Network, Ltd. v. Sharif, — U.S. -, 135 S.Ct. 1932, 1949, 191 L.Ed.2d 911 (2015) (remanding the case for the lower court to determine whether the litigant forfeited his personal right to an Article III adjudication). But because the provision also protects “institutional interests that the parties cannot be expected to protect,” the Supreme Court has held that when courts are presented with structural Article III, § 1 claims, “notions of consent and waiver cannot be dispositive.” Schor, 478 U.S. at 851, 106 S.Ct. 3245. Instead, where structural principles are implicated, courts may ignore a party’s waiver or forfeiture to consider an Article III, § 1 claim de novo. See, e.g., id. at 850-57, 106 S.Ct. 3245 (examining whether an Article I tribunal’s adjudication of a state law counterclaim impermissibly infringed on the judiciary’s domain despite the petitioning party having waived his right to pursue the claim in an Article III tribunal).
The Court has repeatedly reaffirmed this approach. In Plaut v. Spendthrift Farm, Inc., the Court stated that courts have discretion to excuse waivers where parties purport to waive “doctrines central to the courts’ structural independence” such as res judicata. 514 U.S. 211, 231-32, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). *807 Most recently, in Wellness International Network v. Sharif, the Court demonstrated once again that a litigant’s waiver or forfeiture of the “personal right” to an Article III adjudication presents no bar to courts’ consideration of structural Article III claims on the merits. 135 S.Ct. at 1943 (quoting Schor, 478 U.S. at 850, 106 S.Ct. 3245) (emphasis added). Despite recognizing that Sharif may have forfeited his personal right to have a so-called Stem claim adjudicated before an Article III judge, id. at 1941 n.5, 1949, the Court proceeded to consider whether allowing bankruptcy courts to adjudicate Stem claims with the parties’ consent would “impermissibly threaten the institutional integrity of the Judicial Branch,” id. at 1944-46 (internal quotation marks and alteration omitted). Thus, rather than following ordinary rules of appellate procedure under which it would have declined to review a potentially waived or forfeited claim, the Court disregarded the potential forfeiture and considered the structural issue on the merits.
Putting aside whether cases like Schor and Sharif should be read to hold that structural Article III, § 1 claims can never be waived or forfeited, see Al Bahlul II, 792 F.3d at 3-7 (explaining how the Schor line of cases may be read to prohibit waiver or forfeiture of structural Article III claims); id. at 23-24 (Tatel, J., concurring) (same), those cases stand, at the very least, for the proposition that courts should not reflexively apply ordinary rules of waiver and forfeiture to dispose of such claims. Instead, under that line of cases, courts may exercise their discretion to protect the judiciary’s role within our system of government. We believe this is one of those cases in which the court should exercise that discretion.
To be sure, al Bahlul is hardly a sympathetic litigant, and it is tempting to cut him no slack. Not only has he admitted nearly all of the allegations against him, including that he pledged an oath of loyalty to Osa-ma bin Laden and produced al Qaeda recruiting materials, but during his trial he “flatly refused” to put on any defense, conducting a self-styled boycott instead. Al Bahlul I, 767 F.3d at 5-7, 10. The question presented by Schor and its progeny, however, is not whether this court should exercise its discretion for al Bahlul’s sake. The question is whether the court should exercise its discretion to “safeguard[ ] the role of the Judicial Branch in our tripartite system.” Schor, 478 U.S. at 850, 106 S.Ct. 3245. In our view,, the answer here is plainly yes.
As Justice Kennedy observed in Hamdan v. Rumsfeld, “[t]rial by military commission ■ raises separation-of-powers concerns of the highest order.” 548 U.S. 557, 638, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Kennedy, J., concurring). Here, al Bahlul presents substantial questions as to whether the political branches have invaded the judiciary’s domain. Specifically, he argues that Congress and the executive branch have ventured beyond the scope of the Article III exception for law-of-war military commissions sanctioned in Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942), a case four Justices recently described as “the high-water mark of military power to try enemy combatants for war crimes.” Hamdan, 548 U.S. at 597, 126 S.Ct. 2749 (plurality opinion). Determining whether such an expansion of military power is constitutional is especially critical as our nation enters a new era in which many of the traditional constraints on the political branches’ authority to prosecute individuals in military- commissions—including wars’ temporal limits and the presence of clearly defined enemies—are dissipating. See, e.g., Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law. of War:. Hearing Before the Senate Committee oh Armed Services, 111th Cong. 11 *808 (2009) (statement of David Kris, Assistant Attorney General, National Security Division, Department of Justice) (“In the past, military commissions have been associated with a particular conflict of relatively short duration. In the modern era, ... the conflict could continue for a much longer time.”).
In this new context, it is also essential that courts give Congress and the President clear guidance on the offenses that can be tried by law-of-war military commissions. The purpose of such tribunals has long been to “dispense swift justice” in the midst of battle. Hamdan, 548 U.S. at 607, 126 S.Ct. 2749 (plurality opinion). But in recent years, the uncertainty surrounding the legal limits on military commissions has made this form of justice anything but swift. Indeed, Congress first codified conspiracy as an offense triable by military commission a decade ago, and al Bahlul was convicted of inchoate conspiracy over seven years ago. Nevertheless, the legitimacy of that charge remains in doubt. Because clear limits can assist Congress and the Executive as they continue to combat al Qaeda and its associated forces and as they consider the United States’ role in future conflicts, it would be unwise to put off final resolution of the commissions’ authority to preside over such charges for still more years to come. Cf. id. at 589, 126 S.Ct. 2749 (majority opinion) (declining the government’s request to abstain from reaching the merits of an unlawful enemy combatant’s challenge to a military commission’s authority because, among other things, he and the government both had “a compelling interest in knowing in advance whether [he] may be tried by a military commission”).
Asked at oral argument why the court should not exercise its discretion to review this question de novo, the government principally argued that constitutional avoidance principles counseled against it. See Oral Arg. Tr. 58-60 (Dec. 1, 2015). But on that logic, courts would never exercise their discretion to consider structural Article III claims because such claims always implicate constitutional questions. That outcome would stand in direct conflict with the Supreme Court’s instruction that a party’s waiver or forfeiture of a structural Article III claim not be dispositive as to whether a court reaches the claim on the merits.
Although acknowledging that “Schor affords this court some discretion to review a forfeited Article III claim de novo,” Millett Op. at 782, Judge Millett would decline to exercise that discretion here, id. at 782-88. In our view, her reasons for doing so insufficiently account for the central teaching of Schor and its progeny and overstate the consequences of exercising our discretion. In particular, although it is true that the Supreme Court has typically invoked Schor to ignore a party’s waiver or forfeiture of a structural Article III claim in civil cases involving adjudicatory systems premised on the parties’ consent—that is, in cases where parties necessarily waived their right to later challenge the adjudication of their claims in non-Article III fora, see id. at 784-85—those cases recognize that Article III, § 1 protects the judiciary’s role in our system of government and that the judiciary cannot be wholly dependent on litigants to assert its institutional interests, see, e.g., Schor, 478 U.S. at 851, 106 S.Ct. 3245. This principle—that there are Article III, § 1 guarantees that are not the parties’ to waive or forfeit—applies at least as strongly in criminal as in civil cases. See Peretz v. United States, 501 U.S. 923, 925, 937-39, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (acknowledging in the context of a criminal case that, under Schxrr, there may be structural principles litigants cannot waive or forfeit); id. at 950, 111 S.Ct. 2661 (Marshall, J., dissenting) (“Although parties may waive their per *809 sonal guarantee of an independent Article III adjudicator, parties may not waive Article Ill’s structural guarantee.” (internal citation omitted))..
For similar reasons, Judge Millett’s concern that the court not “reward[ ]” al Bah-lul for his refusal to participate in the military proceedings and that excusing al Bahlul’s forfeiture would undermine the judicial process, Millett Op. at 784, misses the point. As already noted, the court, in exercising its discretion to consider the matter de novo, is doing so for the judicial branch’s own benefit, not for al Bahlul’s. And although enforcing forfeitures generally ensures timely raised objections, deters sandbagging of the other party, and enables timely fact-finding and error correction, see id. at 778-79, those concerns are not compelling here because future litigants will have no way of knowing in advance whether courts will exercise their discretion to consider structural Article III claims. Moreover, any disruption to normal appellate process, see id. at 784-85, is “plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.” Glidden Co. v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); see Kuretski v. Commissioner of Internal Revenue Service, 755 F.3d 929, 936 (D.C. Cir. 2014).
In sum, although the government now claims that al Bahlul forfeited his personal right to a trial in an Article III court, it conceded otherwise at every prior stage of this litigation, thereby “forfeiting the forfeiture.” In any event, strong reasons counsel in favor of exercising our discretion to consider the matter de novo. We therefore ask whether Congress has, in the Military Commissions Act of 2006, im-permissibly encroached on the province of Article III courts by authorizing law-of-war military commissions to try alien unlawful enemy combatants for the crime of conspiracy. On that question, too, we think the answer is clear: it has.
II.
By its text, Article III commits the entire “judicial Power of the United States” to the Supreme Court and “such inferior Courts as the Congress may from time to time ordain and establish.” U.S. Const, art. Ill, § 1. It - further provides that “[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under th[e] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority,” id. § 2, cl. 1; that the judges who sit on Article III courts shall enjoy life tenure and salary protections, id. § 1; and that “[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury,” id. § 2, cl. 3.
Over time, the Supreme Court has recognized certain limited exceptions, based on principles “rooted in history and the Constitution,” Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 74, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion), to Article Ill’s commitment of the judicial power to constitutional courts and the judge and jury protections that go along with it. Thus, Congress may create non-Article III courts to try cases in the District of Columbia and U.S. territories. Palmore v. United States, 411 U.S. 389, 390-91, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); American Insurance Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828); see U.S. Const. art. I, § 8, cl. 17. It may assign to administrative agencies the adjudication of private disputes involving “public rights” stemming from federal regulatory programs. Murray’s Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855); see U.S. Const, art. I, § 8, cl. 1. It may also assign certain criminal prosecutions of in *810 dividuals connected to military service to courts martial. Dynes v. Hoover, 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1857); see U.S. Const. art I, § 8, cl. 14. Finally, at issue here, the Supreme Court has upheld a narrow Article III carve-out for military commissions. See Quinn, 317 U.S. at 39-41, 63 S.Ct. 2.
Historically, the government has established military commissions in three situations in which wartime necessity has required them: First, it has established commissions to operate as general courts in areas under martial law. See Ex parte Milligan, 71 U.S. (4 Wall.) 2, 127, 18 L.Ed. 281 (1866) (recognizing that “there are occasions when martial rule can be properly applied”). Second, the government has employed military commissions as general courts in areas that the military temporarily occupies. See Madsen v. Kinsella, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (upholding a military commission’s jurisdiction to try a civilian for murder in' occupied Germany). Third, the government has created commissions to punish enemy belligerents who commit offenses against the laws of war during an armed conflict. See Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3; see also Hamdan, 548 U.S. at 595-97, 126 S.Ct. 2749 (plurality opinion); William WinthROp, Military Law and Precedents 836-40 (rev. 2d ed. 1920) [hereinafter Winthrop, Military Law].
The parties agree that al Bahlul was tried before the third type of tribunal— that is, a law-of-war military commission. They'part ways, however, in defining the permissible scope of those commissions’ jurisdiction. Al Bahlul contends that law-of-war military commissions may try only offenses against the international laws of war, and that the sole remaining charge here, the standalone crime of conspiracy, is not such an offense. The government responds to al Bahlul’s constitutional challenge in two ways. First, it contends that Congress may authorize military commissions to try enemy belligerents for violations of the international laws of war as well as any other offenses Congress defines as violations of the “laws of war.” Following from this point, the government asserts that although conspiracy to commit war crimes is not recognized as an international law-of-war offense, Congress in the Military Commissions Act of 2006 lawfully vested military commissions with authority to try individuals like al Bahlul for the crime of conspiracy. In doing so, the government takes the position that international law imposes no constraints on the kinds of offenses Congress can make triable by military commission. Alternatively, the government takes the slightly narrower position that the military can try enemy belligerents for international war crimes, as well as any offenses punishable under a “U.S. common law of war,” by which the government means any offenses traditionally tried.by military commission in the United States. On this point, the government contends that there is sufficient historical precedent for trying conspiracy before law-of-war military commissions, and that the charge against al Bahlul was, therefore, lawful. Based on the Supreme Court-precedent most directly on point— which we, as a lower court, must follow—al Bahlul has the better of these arguments.
A.
The principal decision that governs here is Ex parte Quirin, a case in which seven Nazi saboteurs challenged, the government’s authority to try them in a military, as opposed to civilian, tribunal. Prior to their arrests, the saboteurs had received military training at a sabotage school in Germany, traveled to the United States by submarine, discarded their military uniforms once ashore, and then traveled to various locales in civilian dress with the apparent intent to destroy U.S. war indus *811 tries and facilities. 317 U.S. at 21, 63 S.Ct. 2.After they were apprehended and detained, President Roosevelt issued an executive order establishing a military commission to try them for offenses against the laws of war and the Articles of War. Id. at 22, 63 S.Ct. 2. Pursuant to that order, the Army Judge Advocate General prepared four charges against the saboteurs, which read as follows:
1. Violation of the law of war.
2. Violation of Article 81 of the Articles of War, defining the offense of relieving or attempting to relieve, or corresponding with or giving intelligence to, the enemy.
3. Violation of Article 82, defining the offense of spying.
4. Conspiracy to commit the offenses alleged in charges 1,2 and 3.
Id. at 23, 63 S.Ct. 2. .
Focusing on the first charge alone, the Supreme Court upheld the commission’s jurisdiction to try the defendants. It observed that “[a]n important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war.” Id. at 28-29, 63 S.Ct. 2. It further found that- Congress had authorized the use of law-of-war military commissions in Article 15 of the Articles of War. Article 15 directed that “the provisions of the[ ] articles conferring jurisdiction upon courts-martial shall not be' construed as depriving military' commissions ... of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be triable by such military commissions.” Id. at 27-28, 63 S.Ct. 2 (emphasis added). By enacting that provision, the Court explained, Congress had
exercised its authority to define and punish offenses against the law of nations-by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.
Id. at 28, 63 S.Ct. 2.
Stating that the term- “law of war” refers to a “branch of international law,” id. at 29, 63 S.Ct. 2 (emphasis added); see also id. at 27-28, 63 S.Ct. 2, the Court proceeded to consider whether the defendants had been charged with a violation of the international rules governing armed conflicts, id. at 30-31, 35-36, 63 S.Ct. 2. It ultimately concluded that they had been, expressing its belief that passing behind enemy lines in civilian dress with the purpose of committing hostile acts was then an offense under international law. Id. at 31, 63 S.Ct. 2. According to the Court, the “precept” that “those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction' of life or property, [are] ... punishable ... by military commission” was “so recognized in practice both here and abroad” and “so generally ;.. accepted as valid by authorities on international law” that it had to be “regarded as a rule or principle of the law of war recognized by this Government by its enactment of the Fifteenth Article of War.” Id. at 35-36, 63 S.Ct. 2.
After concluding that Congress had lawfully authorized the military-commission trial of the offense specified in the first charge, the Court turned to consider whether, despite Congress’s authorization, the jury trial protections in Article III, § 2 and the Fifth and Sixth Amendments nonetheless barred the saboteurs’ prosecution in a military commission. Concluding that they , did not, the Court emphasized *812 that military tribunals “are not courts in the sense of the Judiciary Article,” id. at 39, 63 S.Ct. 2, and that the adoptions of Article III, § 2 and the Fifth and Sixth Amendments were in no way intended to deprive the military of its traditional ability to try enemy belligerents for offenses against the laws of war, id. at 39-41, 63 S.Ct. 2. Violations of the laws of war, the Court observed, have, “since the founding of our government,” been cognizable by military tribunals. Id. at 41, 63 S.Ct. 2. For support, the Court pointed to an 1806 statute subjecting alien spies to death, “according to the law and usage of nations, by sentence of a- general court martial.” Id. at 41, 63 S.Ct. 2. That statute, the Court explained, provided a “contemporary construction of both Article III, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of .war. committed by enemies not in or associated with our Armed Forces.” Id. at 41, 63 S.Ct, 2. Thus, in Quiñn the Supreme Court recognized an exception to Article III and its judge and jury protections for military trials of violations of the “laws of war”—a body of law that, as noted above, the Court described as international. Id. at 29, 63 S.Ct. 2. '
For over seventy years, the Court has treated the phrase “law of war”. as referring to a body of international law, thus reinforcing the idea that Quiñn recognized an Article III exception for international law-of-war offenses. For instance, only four years after Quirin, in In re Yamashita, 327 U.S. 1, 66 S.Ct. 340 (1946), the Court, reaffirming Quirin’s “governing principles,” id. at 9, 66 S.Ct. 340, considered whether a military commission could try a Japanese Commanding General for the “plain violations of the law of war” committed by his troops, based on a command theory of responsibility, id. at 16, 66 S.Ct. 340. Continuing to rely on the Articles of War as having provided congressional authorization for military commissions to try enemy combatants for offenses against the “law of war,” id. at 7, 66 S.Ct. 340, the Court concluded that the commission had jurisdiction over the specified offense, id. at 17-18, 66 S.Ct. 340. Importantly for our purposes here, the Court looked to international sources to determine whether the charges specified offenses against the “laws of war.” Id. at 15-16, 66 S.Ct. 340.
Four years later, the Court again addressed the scope of law-of-war military commissions’ jurisdiction in Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). The Court reiterated the principles laid out in Quirin and Ya-mashita, observing that “[t]he jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established.” Id. at 786, 70 S.Ct. 936 (emphasis added). It again looked only to international sources to conclude that the conduct with which ‘ the petitioners were charged—“[bjreach of the terms of an act of surrender”—violated the international laws governing armed conflicts. Id. at 787-88, 70 S.Ct. 936.
Quirin, as reinforced by Yamashita and Eisentrager, thus upheld the authority of military commissions to try enemy belligerents for violations of the international laws of war without running afoul of Article III. But those cases went no further. And while it is true that those cases did not address the question presented here—i.e., whether military commissions can exercise jurisdiction over crimes unrecognized under international law without offending Article Ill’s structural principles—we, as a lower court, should be hesitant to stretch the exception recognized in those cases in the ways the government suggests. For one thing, a Supreme Court plurality has already de *813 scribed Quinn as “the high-water mark of military power to try enemy combatants for war crimes.” Id. at 597, 126 S.Ct. 2749. For another, law-of-war military commissions present an atextual exception to Article Ill’s vesting of the judicial power in civilian courts, requiring that we construe the exception narrowly. Finally, expanding the scope of military commissions’ jurisdiction would.erode them historical and theoretical underpinnings as an important mechanism for punishing enemy combatants who fail to abide by the internationally agreed upon rules governing the conduct of war.
B.
Given the foregoing principles, the Article III inquiry in this case turns on whether conspiracy to commit war crimes is an offense under the international laws of war. As the government candidly and rightly concedes, it is not. See Brief for the United States 34, Al Bahlul I, 767 F.3d 1, No. 11-1324, 2013 WL 3479237, at *34 (“[T]he government has acknowledged that conspiracy has not attained recognition at this time as an offense under customary international law. This is true even when the objects of the conspiracy are offenses prohibited by customary international law, as some of them are in this case.” (internal citation omitted)); see also Government Response to Defense Motion to Dismiss for Lack of Lack of [sic] Jurisdiction Over the Charge of Conspiracy, AE048A, at 21-22, United States v. Al-Nashiri (M.C. Mar. 26, 2012) (“[H]istory reflects a lack of international consensus for treating the standalone offense of conspiracy as a war crime as a matter of customary international law_” (emphasis omitted)).
To begin, neither the Hague nor the Geneva Conventions—‘the major treaties on the law of war,” Hamdan, 548 U.S. at 604, 126 S.Ct. 2749 (plurality opinion)— mention conspiracy, see Convention with Respect to the Laws and Customs of War on Land (Hague II), July 29,1899, 32 Stat. 1803; Convention Respecting the Laws and Customs of War on Land (Hague TV), Oct. 18,1907, 36 Stat. 2277; Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949,-6 U.S.T. 3516, 75 U.N.T.S. 287; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 3; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 609.
International tribunals established for the prosecution of war crimes, crimes against humanity, and crimes against peace have also declined to recognize conspiracy as a war crime. For instance, the London Charter, which established the International Military Tribunal at Nuremberg for the prosecution of major Nazi war criminals after World War II, did not list conspiracy among the punishable war crimes. See Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8,1945, 82 U.N.T.S. 279 (London Charter). Indeed, the tribunal dismissed a charge for conspiracy to commit war crimes and crimes against humanity because “the Charter d[id] not define as a separate crime any conspiracy except the one to commit acts of aggressive war.” 22 Trial of the Majoe *814 Wak Criminals Before the International Military Tribunal 469 (1948).
The same is true of the charter for the International Military Tribunal for the Far East, 'see Supreme Commander for the Allied Powers at Tokyo, General Order No. 20, Special Proclamation for the Establishment of an International Military Tribunal for the Far East, Apr. 26, 1946, T.I.A.S. No. 1589, 4 Bevans 20; International Military Tribunal for the Far East, Judgment of 4 November 1948, in 22 The Toicyo War Crimes Trial: The Complete TRANSCRIPTS OF THE PROCEEDINGS OF THE International Military Tribunal for the Far East 48,448-51 (R. John Pritchard and Sonia M. Zaide eds. 1981), and the law conferring authority on the forces occupying post-war Germany to punish lower-level Nazi officials for war crimes, See, e.g,, 2 Trials of War Criminals Before the-Nuremberg Military Tribunals Under Control Council Law No. 10, at 122, 174 (1949). As a tribunal established under the latter explained, “[N]either the Charter of the International Military Tribunal nor Control Council Law No. 10 has defined conspiracy to commit a war crime or crime against humanity as a separate substantive crime; therefore, this Tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense.” Id.
More recently, the statutes for the International Criminal Tribunal for the Former Yugoslavia, the International Criminal Tribunal for Rwanda, and the Special Court for Sierra Leone did not identify conspiracy as a violation of the laws of war. See Statute of the International Tribunal for the Former Yugoslavia, annexed to Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808 (1993) S/25704 (May 3, 1993), adopted by S.C. Res. 827 (May 25, 1993), reprinted in 32 I.L.M. 1159 [hereinafter ICTY Statute]; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), reprinted in 33 I.L.M. 1598 [hereinafter ICTR Statute]; Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 138. And, quite tellingly, the Rome Statute, which established the International Criminal Court and which “cata-logues an extensive list of international war crimes,” Hamdan v. United States, 696 F.3d 1238, 1251 (D.C. Cir. 2012), overruled on other grounds, Al Bahlul I, 767 F.3d at 11, does not list conspiracy to commit war crimes as itself a war crime. See Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 [hereinafter Rome Statute].
Other sources on the laws of war likewise recognize that international law has declined to adopt conspiracy to commit war crimes as a standalone offense. See, e.g., Andrea Bianchi & Yasmin Naqvi, International Humanitarian Law and Terrorism 244 (2011); Antonio Cassese, International Criminal Law 191, 197 (2003). Domestic jurists confirm that international law has long rejected conspiracy as a law-of-war offense. Professor George Fletcher observes that, “Since 1948 and the residue of the Genocide Convention in the statutes of the ad hoc tribunals, every relevant international treaty on international humanitarian law or international criminal law .had deliberately avoided the concept and language of conspiracy.” George P. Fletcher, Hamdan Confronts the Military Commissions Act of 2006, 45 Colum. J. Transnat’l L. 427, 448 (2007). William Winthrop, the “Blackstone of military law,” Reid v. Covert, 354 U.S. 1, 19, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion), noted that conspiracy was not a law-of-war offense. Winthrop, Military Law, supra, at 842, cited in Hamdan, 548 U.S. at 597, 126 S.Ct. 2749. Where Winthrop listed the law-of-war violations that had principally been charged in U.S. military commissions, con *815 spiracy was not among them; See id. at 839-40, 106 S.Ct. 3245.
Significantly for the issue before us, international law has adopted conspiracy as a standalone offense in' only two circumstances. First, it has recognized conspiracy to commit genocide. as a crime against humanity. See, e.g., Convention on the Prevention and Punishment of the Crime of Genocide, art. 3(b), Dec. 9, 1948, 78 U.N.T.S. 277; ICTY Statute, supra, art. 4; ICTR Statute, supra, art. 2. Second, it.has acknowledged conspiracy to wage aggressive war as a .crime against peace. See London Charter, art. 6(a). Outside of these two contexts, however, the crime of conspiracy has gained no traction in international law. Hamdan, 548 U.S. at 610, 126 S.Ct. 2749 (plurality opinion). Those exceptions are plainly not at issue here, for al Bahlul was charged with neither.
The limited international acceptance of conspiracy is not due to a lack of consideration. For instance, during negotiations over the London Charter in 1945, the concept of conspiracy as a separate offense generated considerable debate. See Bradley F. Smith, Reaching Judgment at Nuremberg 51 (1977); Robert H. Jaokson, Report of United States Representative to the International Conferenoe on Military Trials, at vii (1947) (“Another point on which there was a significant difference of viewpoint concerned the principles of conspiracy as developed in Anglo-American law, which are not fully followed nor always well regarded by Continental jurists.”). Although the prosecution, led by Justice Robert Jackson, charged the defendants with conspiracy to commit war crimes and crimes against humanity, the tribunal rebuffed the effort, see 22 Trials of the Major -War Criminals Before the International Military Tribunal 412, 469 (1948); Smith, supra, at 135-37, likely due to the controversy surrounding those charges, see Cassese, supra, at 197; Smith, supra, at 121 (reporting that the lead French judge raised several objections to the conspiracy charges, “[bjeginning with the obvious objection- that the crime of conspiracy was unknown to both continental and international law”); see also Tel-ford Taylor, Final Report to the Secretary of the Army on the Nuremberg Trials Under Control Council -Law No. 10, at 70 n.188, 227 (1949) (speculating that the tribunals established in post-war Germany under Control Council Law No. 10 rejected charges for conspiracy to commit war crimes and crimes against humanity because of “the hostility of the French (and probably Soviet) judges to the concept of conspiracy” and recounting that during the proceedings under the London Charter “many European jurists view[ed] the Anglo-Saxon concept of criminal conspiracy with deep suspicion”). Indeed, after returning from Nuremberg, even Justice Jackson wrote approvingly of the “more discriminating principles upon which to prosecute criminal gangs, secret associations and subversive' syndicates” that he had learned of from British, French, Soviet, and German lawyers. Krulewitch v. United States, 336 U.S. 440, 450, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring).
To take a more recent example, during negotiations over the Rome Statute for the International .Criminal Court, the concept of conspiracy again presented a “very divisive issue.” Per Saland, International Criminal Law Principles in The International Criminal Court: The Maxing of the Rome Statute 189, 199-(Roy S. Lee ed., 1999). At least one proposal would have made conspiracy to commit any of the other substantive crimes a punishable offense. See 2 Report of the Preparatory Committee on the Establishment of an International Criminal Court, U.N.GAOR, 51st Sess., Supp. No. 22A, at 94-95, U.N. Doc. A/51/22 (1996), reprinted in M. Cher- *816 if BassiouNI, The Statute of the InternaTIONAL CRIMINAL COURT: A DOCUMENTARY History 489-90 (1998). But the final statute did not incorporate the idea. See Rome Statute. It appears that conspiracy was ultimately excluded as a substantive offense because of “conceptual differences concerning conspiracy among the different legal systems” and because of a belief among some that inchoate conspiracy should be punishable only when its object is an “exceptionally serious crime.” 2 Report of the Preparatory Committee, supra, at 95; see also, e.g., Rapporteur for the Preparatory Committee on the Establishment of an International Criminal Court, Summary of the Proceedings of the Preparatory Committee During the Period 25 March-12 April 1996, at 75-77, A/AC.249/1 (May 7, 1996) (reporting a Japanese proposal to exclude punishment for conspiracy except where it relates tó “exceptionally serious offences,” for which “it may be necessary to punish a conduct of plot or preparation before the commencement of the execution of a crime”).
The emphasis that international tribunals have placed on distinguishing concepts like joint criminal enterprise as a liability theory from the standalone crime of conspiracy further demonstrates conspiracy's lack of acceptance within international law. For example, in rejecting a challenge to the prosecution’s ability to charge a defendant with substantive offenses like murder on a joint criminal enterprise theory of liability—a concept discussed in greater detail below—the Appeals Chamber for the International Criminal Tribunal for the Former Yugoslavia stressed: “Criminal liability pursuant to a joint criminal enterprise is not a liability for mere membership or for conspiring to commit crimes, but a form of liability concerned with the participation in the commission of a crime as part of a joint criminal enterprise, a different matter.” Prosecutor v. Milutinovic, Case No. IT-99-37-AR72, Decision on Dragol-jub Ojdanié’s Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26 (Int’l Crim. Trib. for the Former Yugoslavia,' Appeals Chamber, May 21, 2003).
In sum, conspiracy to violate the laws of war is not a punishable offense under international law. Cf. Hamdan, 696 F.3d at 1249-51 (looking to similar sources to conclude that material support for terrorism is not a violation of the international laws of war). Indeed, not only has the government conceded as much, but a plurality of the Supreme Court has already so found. See Hamdan, 548 U.S. at 610, 126 S.Ct. 2749 (plurality opinion). Accordingly, Congress cannot vest military commissions with jurisdiction to try enemy combatants for that offense without running afoul of Article III.
C.
With inchoate conspiracy lying beyond the reach of any accepted understanding of the international laws of war, the government offers a different interpretation of Quinn and other relevant precedents. Its arguments are unpersuasive.
First, the government insists that Quinn itself demonstrates that the atextual Article III exception for military trials of “law of war” offenses extends to purely domestic war crimes. In support, it claims that “spying and the kindred offense of sabotage”—the offenses the Court examined in Quirin—were not, and have never been, offenses against the international laws of war. Resp’t’s Br. 44-45; see Kavanaugh Op. at 763-65 & nn.6-7. In its view, this shows that the “law of war” to which the Court referred in carving out an Article III excéption includes purely domestic offenses.
The greatest flaw in the government’s argument is that the Court expressly identified the “law of war” as a branch of *817 international law. See Quirin, 317 U.S. at 29, 63 S.Ct. 2. That definition was consistent with the widely recognized understanding of that term. See, e.g., Winthrop, Militaey Law, supra, at 773 (defining the law of war as a “branch of International Law”); Laws of War, Blaok’s Law Dictionary (3d ed. 1933) (“This term denotes a branch of public international law, and comprises the body of rules and principles observed by civilized nations for the regulation of matters inherent in, or incidental to, the conduct of a public war .... ”). It was also consistent with the Quirin parties’ understanding of the term. See Brief for the United States 29, Quirin, 317 U.S. 1, 63 S.Ct. 2 (describing the “law of war” as a “centuries-old body of largely unwritten rules and principles of international law which governs the behavior of both soldiers and civilians during time of war” (citing, inter alia, Winthrop, Military Law, supra, at 773)); Brief for Petitioners 28, Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (“[T]he alleged Law of War which is asserted by the prosecution is a species of international law analogous to common law.”). Had the Court thought that the term actually encompassed a domestic “common law of war,” it likely would have said as much. Thus, we should apply Qui-rin’s Article III exception for military trials of “law of war” offenses as the Quirin Court defined it—that is, as an exception for military trials of those who violate the internationally agreed upon rules governing armed conflict.
But the government’s argument suffers from yet another major flaw—the Supreme Court’s analysis makes clear that it viewed “spying and the kindred offense of sabotage” as offenses against the international laws of war. The Court began its analysis from the premise that Congress had authorized the use of military commissions for “offenders or offenses against the law of war,” Quirin, 317 U.S. at 28, 63 S.Ct. 2, which, as noted above, the Court identified as a “branch .of international law,” id. at 29, 63 S.Ct. 2; see Part II.A, supra. Thus, when it concluded that Congress had vested military commissions with jurisdiction over the offense of having passed behind enemy lines with the intent to commit espionage or sabotage, see Quirin, 317 U.S. at 35-36, 63 S.Ct. 2, it implicitly concluded that those offenses violated the international laws of war.
Further to the point, in analyzing the charge, the Court looked to “[ajuthorities on International Law” who “regarded as war criminals” saboteurs who passed behind enemy lines without uniform, id. at 35 n.12, 63 S.Ct. 2, and it relied on international sources to establish that the offense was, “[b]y universal agreement and practice,” recognized as an international law violation, id at 30 & n.7, 31 n.8, 35 n.12, 63 S.Ct. 2. It also quoted early statutes and military proceedings that appeared to identify spying as punishable by military tribunal according to the “law and usage of nations”—thát is, according to international practice. Id. at 31 n.9, 41, 63 S.Ct. 2. Accordingly, although the government points to scholarly criticism of the Court’s treatment of spying, see Resp’t’s Br. 33-35, we are bound by the Court’s own analysis, which was premised on the understanding that spying and sabotage were international law-of-war offenses. See Quirin, 317 U.S. at 35-36, 63 S.Ct. 2.
The government pushes back, pointing out that Quirin surveyed American historical practice in determining whether the conduct described in the first charge constituted a violation of the “law of war.” In its view, this shows that the Court believed that the “law of war” encompassed domestic offenses. But, once again, the Court in Quirin expressly defined the law of war as a body of international law. Quirin, 317 U.S. at 28-29, 63 S.Ct. 2. It would have been strange for the Court to have defined *818 it as such if it understood that it also encompassed a domestic body of law. Considered in its proper context, then, Qui-rin’s analysis of domestic precedents for trying spying and sabotage reflect an effort to confirm that our law did not preclude a military trial for the specified offense. That is, the Court referred to U.S. cases to discern potential domestic limits on the prosecution of law-of-war offenses. The Court explained that there might be offenses that
would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.
Id. at 29, 63 S.Ct. 2; see id. (citing, as an example of the latter, Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281). The government’s position gains no support from Hamdan’s consideration of domestic precedents in determining whether inchoate conspiracy qualified as a violation of the “law of war,” as that term is used in 10 U.S.C. § 821. The plurality looked to domestic precedent in just the same way the Quirin Court had: as a potential limitation on military-commission jurisdiction. See Hamdan, 548 U.S. at 603, 610, 126 S.Ct. 2749 (plurality opinion); Al Bahlul II, 792 F.3d at 8-9; id. at 25-26 (Tatel, J., concurring).
The government next argues that, Article III must be construed in light of Congress’s Article I powers and that those powers enable Congress to go beyond international law in determining the offenses triable by military commission. In support, the government notes that Quirin and-its progeny indicate that Congress’s power to create military commissions derives from its war powers. Resp’t’s Br. 29-30 (citing, inter alia, Yamashita, 327 U.S. at 11, 66 S.Ct. 340). It then argues that Congress’s power to codify offenses triable by such tribunals must stem from those powers as well. Those powers include the power to “declare War,” U.S. Const, art. I, § 8, cl. II; “raise and support Armies,” id. § 8, cl. 12, “provide and maintain a Navy,” id. § 8, cl. 13, “make Rules for the Government and Regulation of the land and naval Forces,” id. § 8, cl. 14, and “provide for calling forth the Militia,” id. § 8, cl. 15. Pointing out that these powers, unlike the define and punish power, contain no textual limitation based ■ on international law, the government concludes that Congress’s power to define offenses triable by military commissions must be similarly unconstrained. See Resp’t’s Br. 30-32; see also Kavanaugh Op. at 760-68.
As an initial matter, although it is true that Quirin, Yamashita, and Hamdan looked to the war powers in discussing congressional authority to establish military commissions, see Hamdan, 548 U.S. at 591, 126 S.Ct. 2749 (plurality opinion); Yamashita, 327 U.S. at 12, 66 S.Ct. 340; Quirin, 317 U.S. at 26, 63 S.Ct. 2; see also WinthROp, supra, at 831 (stating that Congress’s power “to ‘declare war’ and ‘raise armies’” provided the “original sanction” for military commissions), they consistently looked to the Define and Punish Clause alone in addressing Congress’s authority to confer jurisdiction over particular offenses. See Hamdan, 548 U.S. at 601-02, 126 S.Ct. 2749 (plurality opinion); Yamashita, 327 U.S. at 7, 66 S.Ct. 340; id. At 26, 66 S.Ct. 340 (Murphy, J., dissenting); Quirin, 317 U.S. at 28, 63 S.Ct. 2. For instance, in Yamashita, the Court explained that “the [military] commission derives its existence”, from the war powers, 327 U.S. at 12, 66, S.Ct. 340 (emphasis added), but that its jurisdiction over specific offenses comes from Congress’s “exercise of the power conferred upon it by Article I, § 8, cl. 10 of the Constitution to ‘define and punish * * * Offenses against the Law of Nations * * *,’ of which the law of war is a part.” Id. at 7, 66 S.Ct. 340 (alteration in *819 original). Winthrop endorsed this distinction, stating that Civil War-era legislation subjecting “spies and guerillas” to military jurisdiction “may be regarded as deriving its authority from” the Define and Punish Clause. Winthrop, supra, at 831.
The government argues that it would be “anomalous”—and three of our colleagues call it “absurd”—to conclude that the war powers authorize Congress to establish military commissions but not vest them with jurisdiction over specific offenses. See Resp’t’s Br. 31; Kavanaugh Op. at 762 n.5. But as noted above, the Supreme Court has repeatedly drawn this precise distinction. Thus, even were we to determine the scope of the Article III exception by reference to Congress’s Article I powers, it would still be constrained by international law.
Despite Quirin’s discussion of Congress’s Article I powers in determining whether the President and Congress had the authority to establish military commissions, Quirin did not look to Congress’s Article I powers in determining the scope of the Article III exception. See Quirin, 317 U.S. at 39-41, 63 S.Ct. 2. Rather, it looked to historical practice regarding military commissions at the time that the Constitution was adopted to conclude that Article III posed no bar to military trials of enemy combatants who violate the laws of war. Id.
The government next argues that Congress may define conspiracy to commit war crimes as a law-of-war offense by virtue of its power to define and punish offenses against the “Law of Nations.” See Resp’t’s Br. 55; see also Millett Op. at 793-94. In support, it claims that international law includes sufficiently analogous notions of criminal liability. Resp’t’s Br. 3.
But, as the government admits, “[w]hen conspiracy is used as a mode of liability under international law, there is generally a requirement that the object offense be completed or attempted.” Resp’t’s Br. 56. The military commission in al Bahlul’s case was instructed that it could convict him of conspiracy without “[pjroof that the offense[s]” that were the objects of the conspiracy—murder, attacking civilians or objects, murder and destruction of property in violation of the law of war, terrorism, and providing material support for terrorism—“actually occurred.” Trial Tr. 848. Neither, under these instructions, did al Bahlul’s overt act in furtherance of the conspiracy have to be a criminal act; as an element of proof of a standalone conspiracy charge, the overt act serves merely as “a clear indication that the conspiracy is being carried out.” Id. at 849.
The government also points to prosecutions for conspiracy brought under the domestic laws- of- individual allied governments following World War II, see Resp’t’s Br. 55, but those prosecutions are irrelevant to whether conspiracy was a punishable offense against international law. Many offenses that are punished by many, if not all, countries are not of concern to international law because “international law addresses only those ‘wrong[s]’ that are ‘of mutual, and not merely several, concern’ to States.” Flores v. Southern Peru Copper Corp., 414 F.3d 233, 249 (2d Cir. 2003) (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 888 (2d Cir. 1980)); see also United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1252 (11th Cir. 2012).
To be sure, when Congress legislates for the punishment of war crimes outside of Article III courts, it may have authority to clarify somewhat murky areas of international law. See U.S. Const, art. I, § 8, cl. 10. But Congress certainly has no power to make up that law entirely. See, e.g., Military Commissions, 11 Op. Att’y Gen. 297, 299 (1865) (“To define is to give the limits or precise meaning of a word or thing in *820 being-, to make is to call into being. Congress has'power to define, not to make, the laws of nations (second emphasis added); see also 2 The Records op the Federal Convention op 1787, at 615 (Max Farrand ed., rev. ed. 1937) (Statement of Gouverneur Morris); Bellaizac-Hurtado, 700 F.3d at 1250 (“The insertion of the power to “define” enabled Congress to provide notice to the people through codification; it did not enable Congress to create offenses that were not recognized by the law of nations.”); cf. United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198, 5 L.Ed. 64 (1820) (when exercising its power to define and punish piracy, Congress cannot redéfine that offense). Indeed, in clear contrast to Congress’s authority to “make Rules for the Government and Regulation of the land and naval Forces,” U.S. Const. art. I, § 8, cl. 14 (emphasis added), Congress has the authority only to “define” offenses against the law of nations. See also Noah Webster, 1 A Compendious Dio-TIONARY OF THE ENGLISH LANGUAGE 79 (1806) (“define” means “to explain, limit, mark out, fix, decide”); Samuel. Johnson, 1 A Dictionary op the English Language, at dlvii (6th ed. 1785) (“define” means “to give definition, to explain a thing by its qualities and circumstances”; or “to circumscribe, to mark the limit,-to bound”).
Here, as the government asserts, Congress in the Military Commissions Act of 2006 has done much more than codify an accepted but not fully defined concept of international law; it has made a new war crime, one that the international community has repeatedly declined to adopt. See Part II.B, supra. Whether Congress might be entitled to the type of leeway the government suggests when it exercises its define and punish powers to legislate for the punishment of crimes in Article III courts, it did no such thing in the Military Commissions Act. That Act legislated for the punishment of crimes in military commissions. In doing so, it ran up against a clear constitutional limit:. Article Ill’s commitment of the “judicial Power” to the Supreme Court and “such inferior Courts as Congress may from time to time ordain and establish.” U.S. Const; art. Ill, § 1.
The government also invokes the Necessary and Proper Clause, U.S. Const, art. I, § 8, cl. 18, which authorizes Congress to “make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.” The government argues that Congress may enact legislation necessary to comply with the nation’s “international responsibilities,” and that Congress was reasonably seeking to fulfill its obligation to prevent acts of terrorism and war crimes when it made conspiracy punishable by military commission. Resp’t’s Br. 58. It points to the nation’s responsibilities under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, supra, 6 U.S.T. 3516, 75 U.N.T.S. 287, which prohibits “[c]ollective penalties and likewise all measures of intimidation or of terrorism.” Id. art. 33. The Convention requires signatories to “undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention,” id. art. 146, which include the “willful killing ... of a protected person,” id. art. 147, defined as “those who ... find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals,” id. art. 4.
But the Necessary and Proper Clause does not allow Congress to do what it is otherwise expressly barred from doing. See United States ex rel. Toth v. Quarles, 350 U.S. 11, 21-22, 76 S.Ct. 1, 100 L.Ed. 8 (1955). And however it may affect Congress’s define and punish power when it legislates for the punishment of international offenses in Article III courts, the *821 Necessary and Proper Clause cannot be read to allow Congress to do an end run around the constitutional limit imposed by Article III. See id. at 22, 76 S.Ct. 1; Reid, 354 U.S. at 22, 77 S.Ct. 1222 (plurality opinion); see also Northern Pipeline, 458 U.S. at 73, 102 S.Ct. 2858 (plurality opinion) (“[W]here Art. Ill does apply, all of the legislative powers specified in Art. I and elsewhere are subject to it”).
Article Ill’s limitations on congressional power apply even where Congress exercises its powers to enact “legislation necessary to carry out its international. obligation to prevent terrorism as a mode of warfare.” Resp’t’s Br. 57. The political branches’ efforts to comply with international obligations must also comply with the Constitution. See Medellin v. Texas, 552 U.S. 491, 520, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); Reid, 354 U.S. at 16, 77 S.Ct. 1222 (plurality opinion). Even assuming that Congress could only meet its international obligations by criminalizing conduct not recognized as an offense against international law, the government never explains why its asserted authority to do so under Article I would imply the power to establish military jurisdiction over that conduct. See United States v. Arjona, 120 U.S. 479, 484, 7 S.Ct. 628, 30 L.Ed. 728 (1887).
Ultimately, whether Congress’s authority to codify the offenses triable by military commissions is grounded in its define and punish powers or its war powers is beside the point. So too is the Necessary and Proper Clause’s impact on Congress’s Article I authority to comply with its international obligations by going somewhat beyond the current scope of international law. Whichever clause in Article I, § 8 grants Congress the authority to establish and determine the offenses triable by military commissions, and whatever the impact of the Necessary and Proper Clause on Congress’s Article I powers, Congress may not transgress the bounds of Article III. Article III does include an exception for law-of-war military commissions. But that has been narrowly defined by reference to the international laws and customs governing war. Quirin, 317 U.S. at 38-41, 63 S.Ct. 2.
D.
The government last falls back on the idea that Article Ill’s scope must be determined by reference to historical practice. This argument comes in two forms. First, the government maintains that spying and aiding the enemy are not violations of the international laws of war but that Congress has made those offenses triable by military commission since the early days of the Republic. This, its argument continues, shows that early congresses believed Article III poses no bar to making domestic crimes punishable by military commission. Second, the government maintains that “the experience of our wars and the acts and orders of our wartime tribunals reflect a long history of trying conspiracy to violate the laws of war in a military commission,” Resp’t’s Br. 2-3; see Kavanaugh Op. at 765-68, 769, and that Article III must be considered in light of that practice. Neither argument advances the government’s cause.
With respect to the first, it is true that Congress has long made spying and aiding the enemy punishable by military commission. See, e.g„ An Act for Establishing Rules and Articles for the Government of the Armies of the United- States, § 2, 2 Stat. 359, 371 (1806) (Articles of War). But the government’s reliance on early congressional statutes making spying and aiding the enemy punishable by military commission suffers from two flaws. First, the government cites nothing indicating early congresses actually knew that those two offenses did not violate the international *822 laws of war, and some sources suggest they might well have believed that those offenses did. For instance, an 1806 statute “imposed the death penalty on alien spies ‘according to the law and usage of nations, by sentence of a general court martial.’ ” Quirin, 317 U.S. at 41, 63 S.Ct. 2 (quoting Act of Congress of Apr. 10, 1806, 2 Stat. 359, 371). A 1776 Resolution adopted by the Continental Congress contained a nearly identical provision. See Resolution of Aug. 21, 1776, 5 JouRnals op the Continental CongRess 693 (Ford ed. 1906). In 1865, the Attorney General of the United States, James Speed, also concluded in a formal opinion that “every lawyer knows that a spy was a well-known offender under the laws of war, and that under and according to those laws he could have been tried and punished without an act of Congress.” 11 Op. Att’y Gen. at 312, 313. Thus, we cannot infer from those early statutes that early congresses understood Article III to pose no bar to the punishment of domestic war crimes in military tribunals.
But even were there evidence that early congresses understood that spying and aiding the enemy were not international law-of-war offenses, it would shed little light on whether early congresses felt free to punish purely domestic offenses as they saw fit. Both spying and aiding the enemy have been subject to military jurisdiction since the ratification of the Constitution. See Quirin, 317 U.S. at 41; Resolution of Aug. 21,1776, 5 Journals op the Continental Congress 693 (Ford ed. 1906) (“[A]ll persons, not members of, nor owing allegiance to, any of the United States of America ... who shall be found lurking as spies ,.. shall suffer death, according to the law and usage of nations, by sentence of a court martial .... ”); Resolution of Sept. 20,1776,5 Journals op the Continental Congress 799 (Ford ed. 1906) (“Whosoever shall relieve the enemy with money, victuals, or ammunition, or shall knowingly harbour or protect an enemy, shall suffer death, or such other punishment as by a court-martial shall be inflicted.”); Act of Apr. 10, 1806, 2 Stat. 371. As a result, those two offenses may well fit within an established historical exception.
Indeed, although the government and four of our colleagues contend that Congress’s longstanding practice of making spying and aiding the enemy triable by military tribunal “strongly supports the conclusion that' international law is not a constitutional constraint on Congress’s authority to make particular crimes triable by military commission,” Kavanaugh Op. at 764; see Resp’t’s Br. 32-33; Henderson Op. át 759, incorporating by reference Al Bahlul II, 792 F.3d at 69 (Henderson, J., dissenting), it seems that, if anything, Congress’s consistent decision to codify those two offenses—and those two offenses alone—undermines that conclusion. Had Congress, over the last two hundred years, actually believed itself free to punish by military tribunal whatever wartime conduct it deemed necessary, it would be rather surprising that it codified only two offenses, both of which were subject to military trial at the time the Constitution was adopted. Thus, while these two offenses may fall within an Article III exception based on longstanding historical practice, we find them uninformative regarding Congress’s general authority to make purely domestic crimes punishable by military commission.
This brings us to the government’s final contention that conspiracy has long been tried by military commission in the United States and that it must therefore fall within a historical exception to Article III. Here, too, it falters.
Importantly, when the Supreme Court has relied on historical practice to determine where one branch’s powers end and another’s begin, it has required robust evidence of a historical practice. For instance, *823 in Myers v. United States, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160 (1926), in examining the President’s removal power, the Court found more than seven decades in which Presidents had a continuous practice of removing executive branch officers without congressional involvement, and on that basis held Congress lacked authority to restrict the President’s removal power. In United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 322, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court pointed to an “unbroken legislative practice which has prevailed almost from the inception of the national government to the present day” to reject a constitutional nondelegation challenge to a joint resolution of Congress authorizing the President to determine whether to embargo the sale of arms and munitions to belligerents in a foreign war. Recently, in National Labor Relations Board v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014), the Court invoked a lengthy and dense historical practice defining the scope of the President’s authority under the Recess Appointments Clause, U.S. Const. art! II, § 2, cl. 3. Upon identifying “thousands of intra-session recess appointments” and noting that “Presidents since Madison have made many recess appointments filling vacancies that initially occurred prior to a recess,” id. at 2562, 2571, the Court concluded that the Clause authorized such appointments: By contrast, where the Court found only a handful of instances in which a President had made a recess appointment during an intersession recess lasting less than ten days, the Court held that those' recesses were “presumptively too short to fall within the Clause.” Id. at 2567. ■
There is no such robust history of trying inchoate conspiracy before law-of-war military commissions. See Hamdan, 548 U.S. at 604, 126 S.Ct. 2749 (plurality opinion). The government has identified only a handful of at best ambiguous examples, see Resp’t’s Br. 40-43, and none in which a conviction was for inchoate conspiracy by a law-of-war commission that was affirmed by the Judicial Branch. The examples are unpersuasive in themselves and insufficient to establish a longstanding historical practice that would justify a more, expansive understanding of the law-of-war military commission exception to Article III.
First, the government places substantial reliance on Civil War era historical practice, but that practice does not support its case. For instance, although the charges against the Lincoln assassins referred to conspiracy, the specifications listed the elements of the completed offense—“traitorously” murdering'President Lincoln. See J. Holt & T. Ewing, Charge AND Specifioation Against David E. HeRold, et al. 3 (1865); see also Hamdan, 548 U.S. at 604 n.35, 126 S.Ct. 2749 (plurality opinion); id. at 609, 126 S.Ct. 2749; General Court-Martial Orders No. 356, War Dep’t (July 5, 1865), reprinted m H.R. Doc. No. 55-314, at 696 (1899). The Attorney General’s formal opinion in 1865 also described the charge as “the offence of having assassinated the President.” 11 Op. Att’y Gen. at 297; see id. at'316-17. As such, it appears that conspiracy was at most a theory of liability on which to hold each of the partners to account for the assassination completed by Booth alone.
Construing - the Lincoln assassins’ case as a conspiracy conviction is anachronistic and conflates conspiracy as a theory of liability with inchoate conspiracy as a standalone offense. See Kavanaugh Op. at 766-67. Prosecution of conspiracy as a standalone offense, chargeable apart from and in addition to the crimes that are the conspiracy’s object and carrying their same penalties, is a modern innovation. See Iannelli v. United States, 420 U.S. 770, 781 & n.13, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) (citing Hampton- L. Carson, The Law of Criminal Conspiracies and Agreements, .as Found in *824 the American Cases, in R. Wright, The Law OF CRIMINAL CONSPIRACIES AND AGREEMENTS 191 (1887)). At the time of the Lincoln assassination, it was unclear that conspiracy could even be charged separately from its object offense, once completed. See id. And when Congress first codified conspiracy as a crime in 1867, it carried only a two-year penalty. See Act of Mar. 2, 1867,14 Stat. 471, 484. Conspiracy as then understood would hardly have been an appropriate principal charge against the President’s assassins. The government mistakenly reads our modern understanding of conspiracy into events, including the Lincoln assassins’ conviction, from an era in which that understanding had not yet taken hold, a move that fundamentally miscasts that earlier precedent.
Further, Winthrop noted that the Lincoln assassins’ tribunal was a mixed martial-law and law-of-war military commission. See Winthrop, Military Law, supra, at 839 & n.5; cf. id. at 842. The unreported district court opinion in Ex parte Mudd, 17 F.Cas. 954 (1868), see Kavanaugh Op. at 766-67, does not undermine that conclusion; the district court described the offense as “assassination” of the Commander in Chief and only used “conspiracy” in the same terms as the charging document, while distinguishing Ex parte Milligan based on the state of war in the Capital, not based on the nature of the offense. Ex parte Mudd, 17 F.Cas. at 954. Thus, “even if [it could be] properly classified as a trial by law-of-war commission, [the Lincoln assassins’ trial] is at best an equivocal exception.” Hamdan, 548 U.S. at 604 n.35, 126 S.Ct. 2749 (plurality opinion) (internal citation omitted); see also Al Bahlul II, 792 F.3d at 12.
Second, the government asserts that other Civil War precedents show that defendants were charged with conspiracies as unconsummated offenses. Resp’t’s Br. 42-43. The examples on which it relies do not support its position. Col. George St. Leger Grenfel was convicted by a military tribunal of conspiracy to free prisoners of war in Chicago and to destroy that city. See General Court Martial Orders No. 452, War Dep’t (Aug. 22, 1865), reprinted in H.R. Doc. No. 55-314, at 724-35. As al Bahlul points out, Grenfel’s commission, like that of the Lincoln assassins, was a “hybrid” commission exercising jurisdiction based in part on the President’s declaration of martial law. See Reply Br. 20 (citing Hamdan, 548 U.S. at 609 n.37, 126 S.Ct. 2749 (plurality opinion); Winthrop, Military Law, supra, at 839 n.5); S. Starr, Colonel Grenfel’s Wars: The Life of a Soldier of Fortune, 5, 219 (1971) (cited in Resp’t’s Br. 41). Such hybrid commissions “regularly tried war crimes and ordinary crimes together,” Hamdan, 548 U.S. at 608, 126 S.Ct. 2749, and the crimes charged were, “ ‘[n]ot unfrequently[,] ... a combination of the two species of offenses’ ”—that is, hybrid versions of law-of-war offenses and domestic crimes, id. (quoting C. Howland, A Digest of Opinions of the Judge Advooates General of the Army 1071 (1912)). These cases thus provide little insight into the traditional jurisdiction of pure law-of-war military commissions. Indeed, in defending the jurisdiction of the Grenfel commission, the prosecution relied on the fact that “martial law obtained throughout the United States and the Territories during the continuance of the [Civil] [W]ar,” Judge Advocate’s Reply, Courtroom, Cincinnati, Ohio, Jan. 17, 1865, United States v. Walsh, et al., reprinted in H. Exec. Doc. No. 50, 39th Cong., 2d Sess., at 20. The Grenfel commission, like the Lincoln assassins’ commission, “is at best an equivocal” example. Hamdan, 548 U.S. at 604 n.35, 126 S.Ct. 2749 (plurality opinion).
The government’s reliance on the case of Confederate Army Captain Henry Wirz is *825 similarly misplaced; in his case conspiracy served only as a mode of liability for the completed law-of-war offenses of abusing, torturing, and murdering war prisoners. General Court Martial Orders, No. 607, War Dep’t (Nov. 6, 1865), reprinted in H.R. Doc. No. 55-314, at 785, 789.
Also unavailing are the government’s citations to William Winthrop’s 1880 Digest of Opinions of the Judge Advocate General of the Army and to Charles Roscoe Howland’s 1912 Digest of Opinions of the Judge Advocate General of the Army. Both stated that, during the Civil War, one of the principal offenses charged in military commissions as an offense against the laws of war was “[cjonspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy.” W. Winthrop, A Digest of Opinions of the Judge Advooate General of the Army 329 (1880); Howland, supra, at 1071. But a Supreme Court plurality has already examined the eases cited and concluded that they provide “no support for the inclusion of conspiracy as a violation of the law of war.” Hamdan, 548 U.S. at 607, 126 S.Ct. 2749 (plurality opinion). And, as that plurality further noted, Winthrop’s subsequent treatise, Military Law and Precedents, does not list conspiracy as an offense against the laws of war. Id. at 608, 126 S.Ct. 2749 (citing Winthrop, Military Law, supra, at 839-40).
Indeed, in his later treatise, Winthrop clarified the issue. In describing the mixed jurisdiction of military commissions during the Civil War, he noted that the tribunals presided over two classes of offenses—“(1) Crimes and statutory offenses cognizable by State or U.S. courts, and which would properly be tried by such courts if open and acting; [and] (2) Violations of the laws and usages of war cognizable by military tribunals only.” Winthrop, Military Law, supra, at 839. He identified criminal conspiracy as a crime of the first class, but made no mention of conspiracy in the second. In a footnote, he also identified many of the conspiracy cases to which the government now points, including those of Wirz, Grenfel, and the Lincoln assassins, as having been of the first class (i.e., cases charging crimes normally triable only in civil court) or “of the first and second classes combined,” id. at 839 n.5, that is, cases charging “species of compound offense[s] of the' type tried by the hybrid military commissions of the Civil War,” Hamdan, 548 U.S. at 608, 126 S.Ct. 2749 (plurality opinion). Those cases, thus fail to support the government’s contention that there is a robust history of trying conspiracy in pure law-of-war military commissions.
Third, the government draws on World War II-era practice. Although the charges against the Nazi saboteurs in Quirin included conspiracy, the Supreme Court upheld the jurisdiction of the law-of-war military commission only as to the charge of passing behind enemy lines with hostile purpose and did not mention conspiracy in its analysis. See Quirin, 317 U.S. at 46, 63 S.Ct. 2. Similarly, although William Cole-paugh was convicted of sabotage and spying, in addition to conspiracy to commit those offenses, the U.S. Court of Appeals for the Tenth Circuit affirmed the jurisdiction of the military tribunal in view of the law-of-war offense of.unlawful belligerency only, without addressing the conspiracy charge.. See Colepaugh v. Looney, 235 F.2d 429, 431-32 (10th Cir. 1956).
The government insists that these cases are nonetheless important because “despite such judicial review, ‘no U.S. court has ever east any doubt on the landmark military commission convictions embracing conspiracy charges, or the validity of trying conspiracy by military commission.’” Resp’t’s Br. 37-38 (quoting Al Bahlul I, 767 F.3d at 70 (Kavanaugh, J., concurring *826 in the judgment in part and dissenting in part)) (alterations omitted). To this, it adds that executive branch officials, including the President, approved the charges in both cases, thereby giving their “imprimatur” to the convictions. Id. at 38.
But at most those cases underscore the uncertain position that the crime of conspiracy has occupied in the history of military commissions. The defendants in both Quinn and Colepaugh challenged the conspiracy charges on the ground that the military commissions lacked jurisdiction over that offense, see Brief for Petitioner at 29, Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3; Opinion of Special Board of Review, United States v. Colepaugh, CM 276026, at 28 (Mar. 27, 1945), suggesting that it was in no sense well established that military tribunals had jurisdiction to preside over conspiracy charges. Additionally, the court in each case focused on completed violations of the international laws of war and declined to address the legitimacy of the conspiracy charges, indicating that those charges may-have presented difficult questions. In Hamdan, four Justices recognized as much, stating:
If anything, Quirin supports Hamdan’s argument that conspiracy is not a violation of the law of war. Not only did the Court pointedly omit any discussion of the conspiracy charge, but its analysis of Charge I placed special emphasis on the completion of an offense; it took seriously the saboteurs’ argument that there can be no violation of the law of war—at least not one triable,by military commission—without the actual commission, of or attempt to commit a hostile and warlike act.
548 U.S. at 606-07, 126 S.Ct. 2749 (plurality opinion) (internal quotation marks omitted). Thus, these cases appear neutral at best and, more likely, undermine the government’s position.
The government also relies on evidence that the executive branch has viewed conspiracy as triable by military commission, suggesting that this is entitled to some weight. Resp’t’s Br. at 34-46; see Kavanaugh Op. at 765-68. But the executive branch opinions on which it relies rest on shaky foundations. For example, although Assistant Attorney General Tom Clark concluded in á memorandum that William C. Colepaugh could be tried for conspiracy in a law-of-war military commission, the sources on which he relied drew almost exclusively from martial-law commissions that exercised plenary jurisdiction, not law-of-war military commissions of the kind at issue here. See Memorandum from Tom C. Clark, Assistant Attorney General, to Myron C. Kramer,. Judge Advocate General (Mar, 12, 1945), reprinted in Government Supplemental Appendix 104-10 (citing, inter alia, the Lincoln Assassins and Captain Wirz).
. The orders of General MacArthur from the Korean Conflict, see Resp’t’s Br. 39; Millet Op. at 795, also offer little, if any, support for the government because the en banc court has viewed such military orders as unpersuasive for lack of high-level Executive Branch consultation. See Al Bahlul I, 767 F.3d at 25 n.16. And during the Korean Conflict there apparently were no prosecutions conducted by United Nations Military Commissions. See JORDAN J. Paust ET AL., INTERNATIONAL CRIMINAL LAW: CASES and Materials 724 (1996).
In sum, the Supreme Court has recognized a limited Article III exception for the prosecution of internationally recognized war crimes in military tribunals. The government has offered no reason—rooted in history, the Constitution, case law, or anything else—for extending that exception further.
*827 III.
We turn now to the additional arguments of our colleagues.
A.
Four of our colleagues believe that Hamdan supports the notion that Congress can vest láw-of-war military commissions with jurisdiction over inchoate conspiracy without transgressing the bounds of Article III because several Justices in Hamdan “expressly invited Congress to clarify the scope of military commission power” without “even hint[ing] at a lurking constitutional problem with trying conspiracy offenses before military commissions.” Kavanaugh Op. at 771; see also Henderson Op. at 759, incorporating by reference Al Bahlul II, 792 F.3d at 50-52 (Henderson, J., dissenting); Resp’t’s Br. 53.
The Justices’ invitation to Congress in Hamdan is, however, a thin reed on which to rest. For one thing, it is far from clear that the invitation was in any way related to Congress’s ability to make inchoate conspiracy punishable by military commission. Hamdan's principal holding was that the commissions convened under Military Commission Order No. 1, such as Salim Hamdan’s, were invalid because their procedures failed to comport with statutory requirements. 548 U.S. at 613, 126 S.Ct. 2749. The Justices’ may have thus intended their “invitation” to underscore nothing more than Congress’s power to authorize the invalidated procedures. See id. at 636, 126 S.Ct. 2749 (Breyer, J., concurring) (“Congress has denied the President the legislative authority to create military commissions of the kind at issue here. Nothing prevents the President from returning to Congress to seek the authority he believes necessary,”).
Perhaps equally important, the issues presented in Hamdan did not include the question we consider here, i.e., whether Article III limits Congress’s authority to vest military commissions with jurisdiction over conspiracy charges. The two questions on which the Supreme Court granted certiorari asked: (1) whether the President required congressional authorization to establish law-of-war military commissions and, if so, whether the' President had' received such authorization; and (2) whether Guantanamo detainees could enforce the provisions of the 1949 Geneva Conventions in habeas corpus proceedings. Although the parties’ briéfs in Hamdan touched on related issues, neither side squarely addressed Article Ill’s limits on military-commission jurisdiction. This court should, accordingly; not read too much into the Justices’ invitation.
Next, Judge Kavanaugh, like the government, believes that Congress derives its authority to determine the offenses triable by military commission from its war powers and that‘those powers are unconstrained by international law. In his view, the Constitution cannot possibly give the international community—through the development of international law—the ability to limit Congress’s exercise of its war powers. Kavanaugh Op. at 762-63. It is not international law, however, that constrains Congress’s authority here—it is Article III, The Framers of the Constitution expected Article III courts to have jurisdiction over the trial of all crimes, Toth, 350 U.S. at 15, 76 S.Ct. 1; Reid, 354 U.S. at 21, 77 S.Ct. 1222 (plurality opinion), save for a few narrow exceptions, such as battlefield prosecutions of enemy combatants who “in their attempt to thwart or impede our military effort have violated- the law of war,” Quirin, 317 U.S. at 28-29, 63 S.Ct. 2; id. at 41-42, 63 S.Ct. 2. The international-law constraint that Quirin recognized and that we would apply here functions not as an independent constraint- on the political branches’ powers to wage war, but rather as an essential demarcation between mili *828 tary and civilian jurisdiction. Without it, “the line between civilian and military jurisdiction could become elusive—if not altogether illusory.” National Institute of Military Justice Amicus Br. 29. We find apt here the Supreme Court’s warning in Northern Pipeline, 458 U.S. at 73-74, 102 S.Ct. 2858 (plurality opinion), against constitutional interpretations that would “replace the principles delineated in [Supreme Court] precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government.”
■ The idea that international law has a role to play in our constitutional framework is also not as surprising as one might think. The Framers of the Constitution well understood that our country’s newly forged sovereignty brought with it both rights and obligations. John Jay, the first Chief Justice of the United States, explained in 1793 that the United States “had, by taking a place among the nations of the earth, become amenable to the laws of nations.” Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 474, 1 L.Ed. 440 (1793) (opinion of Jay, C.J.). Embracing the law of nations and adhering to its principles, he further explained, was the new nation’s “duty” and in its own “interest.” Id.; see also Who Privileged from Arrest, 1 Op. Att’y Gen. 26, 27 (1792) (The law of nations’ “obligation commences and runs with the existence of a nation.”).
There is nothing anomalous or contrary to national security in vesting Article III courts with exclusive power to try all crimes except for internationally recognized war crimes that have been traditionally tried by military commission. Our military has long abided by the international laws of war. For instance, in its 1940 Rules of Land War, it noted that the “well-established rules known as the rules or laws of war” that govern the conduct of war among civilized nations “are binding upon all civilized nations,” and are to “be strictly observed by our forces.” War Department, Rules of Land Warfare 1-2 (1940). Both the Framers’ and our military’s desire to adhere to the law of nations and, more specifically, the laws of war appears sound: “If the United States now decides that it can hold foreign personnel accountable for violating ‘national’ law-of-war rules, other states will be entitled to assert the same authority.” Glazier Amicus Br. 27; see Arjona, 120 U.S. at 487, 7 S.Ct. 628 (“[W]hat is law for one is, under the same circumstances, law for the other.”).
Standing firm on the constitutionally prescribed boundaries between civilian and military jurisdiction is-compelled by Supreme Court precedent and doubly compelled where, as here, the government has made no claim of military necessity. Military exigency, although insufficient to justify military jurisdiction, is nevertheless a necessary condition. Hamdan, 548 U.S. at 590, 126 S.Ct. 2749. But remarkably, throughout this protracted litigation, the government has offered no reason to believe that expanding the traditionally understood scope of Article Ill’s exception for law-of-war military commissions is necessary to meet a military exigency. We claim no authority to determine military necessity; we simply note that the government has asserted no such exigency here. Perhaps the government has eschewed a claim of military necessity because of the many other tools at its disposal. Congress remains free to enact, and the President to employ, domestic laws to bring terrorists to justice before Article III courts, as they have on hundreds of occasions already with remarkable success. See Al Bahlul II, 792 F.3d at 27 (Tatel, J., concurring); Center on Law and Security, New York University School of Law, Terrorist Trial Report Card: September 11, 2001-September *829 11, 2011, at 2, 7, tbl.l, available at http:// goo.gl/Ks30kc (reporting that in the ten years after September 11, 2001, federal prosecutors had obtained convictions in almost 200 “jihadist-related” terrorism and national security cases); Press Release, Department of Justice, Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System (June 9, 2009) (citing Richard B. Zabel & James L. Benjamin, Jr., Human Rights First, In Pursuit of Justice: Prosecuting Terrorism Cases in the Federal Courts 23 (May 2008), available at http://www.humanrights first.org/resource/pursuit-justice); see also, e.g., Nizar Trabelsi, No. 15-3075 (D.C. Cir., argued May 17, 2016); United States v. Ghailani, 733 F.3d 29 (2d Cir. 2013).
For detainees ill-suited for prosecution in Article III courts, the government has other options. It may detain them as enemy belligerents. See Hamdi v. Rumsfeld, 542 U.S. 507, 518-24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion). It may continue to try violations of the laws of war in military commissions. See, e.g., Government Response to Defense Motion to Dismiss for Lack of Jurisdiction, AE107A, at 1, United States v. Mohammad (M.C. Jan. 16, 2013) (acquiescing to Khalid Shaikh Mohammad’s and his code-fendants’ motion to dismiss charges for inchoate conspiracy, but continuing to pursue charges of recognized law-of-war offenses, including attacking civilians on September 11, 2001). It might also help craft new international conventions to address the demands of new kinds of war and implement appropriate procedures for prisoners of war. See generally Hamdan, 548 U.S. at 619, 126 S.Ct. 2749.
On this note, it is worth remembering that, historically, the military has not been in the business of prosecuting individuals for crimes and locking them up for life. Its primary mission has always been to defeat our enemies on the battlefield. Cf. Reid, 354 U.S. at 35, 77 S.Ct. 1222 (plurality opinion) (“[T]he business of soldiers is to fight and prepare to fight wars, not to try civilians for their alleged crimes.”); Toth, 350 U.S. at 17, 76 S.Ct. 1 (“Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.... [Tjrial of soldiers to maintain discipline is merely incidental to an army’s primary fighting function.”). To be sure, punishing enemy belligerents who violate the international rules governing armed conflicts is an “important incident” to waging war. Quirin, 317 U.S. at 28, 63 S.Ct. 2. Such punishment helps encourage adherence to the laws of war. But restricting the military’s ability to intrude on the judiciary’s domain hardly raises the types of concerns that enforcing the limits on the President’s other war powers could.
B.
Judge Millett and Judge Wilkins take a very different tack. Although seeming to recognize the lack of legal support for prosecuting inchoate conspiracy before pure law-of-war military commissions, they believe that we can nonetheless affirm al Bahlul’s conviction because they think the facts, as they understand them to have been found by the military commission members, necessarily show that al Bahlul engaged in conduct for which he could have been tried and punished in a military commission. See Millett Op. at 775, 789-93; Wilkins Op. at 797, 801-04. In other words, they would overlook the fact that al Bahlul was charged only -with conspiracy as a standalone crime because,- as they see it, record evidence could have supported criminal liability under international law— e.g., for the murder of protected persons under a joint criminal enterprise theory of liability—and there is, therefore, no Article I or Article III problem. Millett Op. at *830 789-93; Wilkins Op. at 803-04. That approach suffers from several flaws.
Most critically, the government never even hinted at such an approach in its brief. To the contrary, at every turn, the government defended al Bahlul’s conviction on the ground that it could lawfully charge and prosecute him in a military commission for the crime of inchoate conspiracy to violate the laws of war. For instance, in response to al Bahlul’s contention that military commissions have historically taken cognizance of only completed war crimes, Pet’r’s Br. 13, the government did not argue that the court could sustain his conviction on the ground that al Bahlul was essentially found guilty of participating in a completed war crime. It tacked in the opposite direction, asserting that there is historical precedent for trying conspiracy in cases where the object offenses were never completed. See Resp’t’s Br. 42-43. Moreover, in arguing that Congress acted consistently with international law, the government did not take the opportunity to defend al Bahlul’s conviction as resting on conduct virtually the same as conduct for which he could have been punished under international law. See id. Instead, it acknowledged that the crime for which al Bahlul was charged and convicted differed from any recognized international law concept of criminal liability, because to support a war crime conviction on a joint criminal enterprise theory of liability international law generally “require[s] that the object offense be completed or attempted,” id. at 56, and the government stressed that the MCA’s “requirement that the defendant personally commit an overt act is not the same as the requirement that the object crime be completed,” id.
It is by now well established that this court ordinarily declines to decide cases based on arguments not raised by either party. As we have explained on numerous occasions, “[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research.” Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983). Rather, we sit as “arbiters of legal questions presented and argued by the parties before [us].” Id.; see United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 60 n.2, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981) (“We decline to consider this argument since it was not raised by either of the parties here or below.”); Fed. R. App. P. 28(a)(8)(A), (B) (requiring parties to set forth their legal and factual contentions, “the reasons for them,” and “citations to the authorities and parts of the record” on which they rely). The reason for restraint is obvious: “Rulings on issues that have not been fully argued run the risk of being improvident or ill-advised.” United States v. West, 392 F.3d 450, 459 (D.C. Cir. 2004) (internal quotation marks omitted); cf. Hamdan, 548 U.S. at 601 n.32, 126 S.Ct. 2749 (plurality opinion) (criticizing Justice Thomas’s focus on crimes not charged and noting that “the Government plainly had available to it the tools and the time it needed to charge petitioner with the various crimes [Justice Thomas] referred] to, if it believed they were supported by the allegations.”). Here, venturing down the path proposed by Judge Millett and Judge Wilkins without the aid of the parties runs the risk of misinterpreting record evidence and failing to anticipate legal objections that the parties might have to this approach.
We put those concerns aside only to explain why we believe that Judge Millett’s and Judge Wilkins’s analysis is incorrect. First, we fail to see how their emphasis on facial versus as-applied challenges makes a difference with respect to al Bahlul’s Article III claim. The Article III inquiry focuses on the nature of the offense charged. It is true that courts generally should not concern themselves with the application of statutes beyond the facts of the eases be *831 fore them, but al Bahlul never asks us to do so. The circumstances of his prosecution make plain that his conviction runs afoul of Article III because he was charged and prosecuted in a military commission for a crime that is not triable before such a tribunal. Thus, in seeking to overturn his conviction, al Bahlul does not ask the court to consider the rights of hypothetical defendants or to consider whether the MCA might impermissibly authorize trial by military commission for offenses other than what was charged here. He asks this court to consider only the circumstances of his own prosecution and conviction. And, for the reasons stated in Part II, supra, his prosecution and resulting conviction in a military commission for inchoate conspiracy was invalid.
' Attempting to avoid this conclusion, our colleagues suggest an “as-applied” approach under which the court would look past the charges against al Bahlul and uphold his conviction so long' as the military commission members’ findings could have supported criminal liability for a law-of-war offense. See Millett Op. at 775, 788-93; Wilkins Op. at 797-800, 801-04. That, we think, not only asks the wrong question, but would raise other serious problems with al Bahlul’s conviction. Most critically, it would violate basic principles of criminal justice, including- that an accused know the charge against him and that a conviction match the charge. Importantly, al Bahlul was neither charged with nor convicted of substantive war crimes, such as the murder of protected persons, on a joint criminal enterprise or conspiracy theory of liability. Instead, as seven members of this court recognize, al Bahlul was charged with, tried for, and convicted of the standalone crime of conspiracy. See Kavanaugh Op. at 759; Henderson Op. at 759, incorporating by reference Al Bahlul II, 792 F.3d at 47 (Henderson, J., dissenting).
In the United States, conspiracy is both a crime and a theory of liability. Although the two concepts share the same name, they are quite distinct. The crime of conspiracy makes it unlawful for two or more persons to. agree to commit a crime. See, e,g., Iannelli, 420 U.S. at 777, 95 S.Ct. 1284; Smith v. United States, — U.S. -, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013); Model Penal Code § 5.03(1). The crime of conspiracy is therefore complete as soon as two or more conspirators enter into an agreement to commit an unlawful act (and, depending on the jurisdiction, as soon as one of the conspirators commits an overt act in furtherance of the conspiracy’s objectives). It matters not at all whether the conspiracy ever achieves its intended purpose.
By contrast, conspiracy as a theory of liability is a mechanism for holding individuals responsible for crimes committed pursuant to a conspiratorial agreement. For instance, if A and B agree to murder someone and A shoots the gun while B acts as a lookout, B can be held just as responsible, for the murder as A. Under the Pinkerton doctrine, an- individual who joins a conspiracy can be held responsible for completed crimes he or she agreed to as part of the conspiracy and for any other crimes committed in furtherance of- the conspiracy that were its reasonably foreseeable result. See Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Critically, when conspiracy serves as a mode of liability, the defendant is charged with, tried for, and convicted, of substantive crimes, such. as murder, bank robbery, or wire fraud, that were committed in the course of a conspiracy. That is, the indictment or charge sheet against the. defendant will list murder, bank robbery, or wire fraud as the criminal offense for which the defendant is being tried, and the final judgment of conviction will identify murder, bank robbery, *832 or wire fraud as the crime committed; conspiracy simply acts as the theory on which the defendant is held accountable for those crimes.
As explained previously, international law has repeatedly rejected conspiracy to commit war crimes as a standalone offense. See Part II.B, supra. It does, however, embrace a species of conspiracy liability known as joint criminal enterprise. Hamdan, 548 U.S. at 611 n.40, 126 S.Ct. 2749 (plurality opinion); see Milutinovié, Decision on Dragoljub Ojdanié’s Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26. Under one formulation of joint criminal enterprise liability, akin to Pinkerton liability, an individual can be held responsible for the criminal acts of other members of an enterprise so long as those acts were a “natural and foreseeable consequence of the ... [enterprise’s] common purpose.” Prosecutor v. Tadic, Case No. IT-94-1-A, Judgement, ¶ 204 (Int’l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, July 15,1999).
As mentioned above, Judge Millett and Judge Wilkins would ignore the government’s prosecutorial choice to charge al Bahlul with, and convict him of, the crime of conspiracy, see Charge Sheet, AE01, United States v. al Bahlul (M.C. Feb. 26, 2008); see 10 U.S.C. § 950v(b)(28) (2006), and would instead uphold his conviction on the ground that he could have been punished in a military commission for other international law-of-war offenses—like the murder of protected persons on September 11, 2001—based on a joint criminal enterprise or Pinkerton theory of liability, see Millett Op. at 788-98; Wilkins Op. at 801-04. Meanwhile, our other colleagues simply do not address the distinction between the standalone crime of inchoate conspiracy of which al Bahlul was convicted, and conspiracy as a theory of liability for proven war crimes. See, e.g., Kavanaugh Op. at 766-68.
The basic point here is an important one: the government chose not to pursue charges against al Bahlul for the murder of protected persons, attacking civilians, or any other recognized war crime for which he could have been tried under the 2006 MCA. See Charge Sheet, supra-, see also Trial Tr. 109-118; Oral Arg. Tr. 46-47 (Dec. 1, 2015) (acknowledging that the government did not pursue a joint criminal enterprise theory of liability for substantive war crimes). Nor did the commission convict al Bahlul of murdering protected persons, attacking civilians, or committing any other substantive law-of-war offense. See Findings Worksheet, AE074, United States v. al Bahlul (M.C. Oct. 31, 2008). In fact, the military judge expressly instructed commission members that in order to convict al Bahlul on Charge I, the conspiracy charge, they did not need to find that any of the alleged objects of the conspiracy—such as the murder of protected persons—actually occurred. See Trial Tr. 848. They had to find only: (1) that al Bahlul entered into an agreement with Osama bin Laden and others to commit an offense triable by military commission; (2) that al Bahlul knew the purpose of the agreement and joined it willingly and with the intent to further that purpose; and (3) that al Bahlul committed one of several overt acts in furtherance of the agreement, none of which had to be criminal, much less an international law-of-war offense. See id. 846, 849.
If two of our colleagues believe that the military commission members actually found al Bahlul guilty of substantive offenses based on a conspiracy theory of liability because they indicated on their Findings Worksheet that al Bahlul was “guilty” of each object offense, including murder of protected persons, see Millett Op. at 775, 790; see also Findings Worksheet at 2, they are mistaken. Although that section of the worksheet somewhat *833 confusingly begins “Guilty of Some, but Not All Objects of the Conspiracy” and then gives the members a place to circle “guilty” or “not guilty” next to each of the alleged objects of the conspiracy, it is clear that by circling “guilty” next to each substantive offense, the members were indicating only that al Bahlul had joined a conspiracy that had as its object each of the listed offenses. The charge was identified as “conspiracy,” Findings Worksheet at 2, and the military commission judgé expressly instructed the members that “[i]n the specification of Charge I, the accused is charged with the offense of conspiracy,” Trial Tr. 845 (emphasis added). The judge never so much as hinted that Charge I also encompassed substantive offenses on a conspiracy theory of liability. See id. When one looks, at the Findings Worksheet as a whole, it is also clear that the sections permitting the members to find al Bahlul “guilty” or “not guilty” of specific objects of the. conspiracy and specific overt acts merely provided the members the opportunity to find, with respect to the specification for Charge I, that the conspiracy had some but not all of the alleged offenses as its objects or that al Bahlul had committed some but not all of the alleged overt acts. Tellingly, too, the government has never argued that the Findings Worksheet shows that the commission members actually found al Bahlul guilty of substantive offenses.
There is simply no basis for upholding a conviction for the crime of inchoate conspiracy on the ground that a defendant could have been charged with and convicted of some other crime. To do so would violate the most fundamental tenets of our criminal justice system—that a defendant is entitled to notice of the charges against him and that a conviction match the charge or be a lesser included offense. As the Supreme Court has explained, due process demands that a defendant have “notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge.” Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948). “It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.” Id. The Court has thus squarely rejected the notion that an appellate court can sustain a conviction under a provision never charged, explaining that “[t]o conform to due process of law, [defendants] [a]re entitled to have'the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court.” Id. at 202, 68 S.Ct. 514. We sincerely doubt that these most basic principles of due process—well established under both American and international law—can be cast aside in the military commission context. See id.; see also, e.g., Geneva Convention Relative to the Treatment of Prisoners of War, supra, art. 105, 6 U.S.T. at 3396, 75 U.N.T.S. at 214 (“Particulars of the charge or charges on which the prisoner of war is to be arraigned, as well as the documents which are generally communicated to the accused by virtue of the laws in force in the armed forces of the Detaining Power, shall be communicated to the accused prisoner of war in a language which he understands, and in good time before the opening of the trial.”); ICTY Statute, supra, arts. 18, 20-21; ICTR Statute, supra, arts. 17, 19-20; cf. Rome Statute, art. 22, § 2, supra; United States v. Longmire, 39 M.J. 536, 538 (A.C.M.R. 1994) (recognizing in the court-martial context that a “basic principle of due process” is that “an individual should not be made to face criminal charges without having been notified of what he must defend against and without having been protected against double jeopardy”).
But we have no need to rely on constitutional or international-law principles to *834 question the validity of an affirmance on grounds other than those charged and tried, as both the Military Commissions Act of 2006 and the rules promulgated thereunder incorporate these same notice principles. The Act “establish[es] a two-step process for initiating a trial before a military commission,” Obaydullah v. Obama, 609 F.3d 444, 445-46 (D.C. Cir. 2010), pursuant to which an authorized person subject to the Uniform Code of Military Justice must swear a charge, under oath, against a defendant, 10 U.S.C. § 948q(a); see Manual for Military Commissions, Rule for Military Commissions (R.M.C.) 307, at 11-15 (2007). The Act further requires that, once charges are sworn against an accused, he be promptly informed of them. 10 U.S.C. § 948q(b); see R.M.C, 308. The Act also specifies, in language similar to that used in the Geneva Conventions, see Geneva Convention Relative to the Treatment of Prisoners of War, supra, art. 105, 6 U.S.T. at 3396, 75 U.N.T.S. at 214, that the government must serve the accused with “a copy of the charges upon which trial is to be had in English and, if appropriate, in another language that the accused understands, sufficiently in advance of trial to prepare a defense,” 10 U.S.C. § 948s. With minor exceptions not relevant here, any fact that increases the maximum punishment authorized must be alleged in the charge’s specification, R.M.C. 307(c)(3), and substantive changes to the charges cannot be made without newly referring charges and notifying the accused, R.M.C. 603(d). Finally, Rule 801(d) on “[u]n-charged offenses” provides that, “[i]f during the trial there is evidence that the accused may be guilty of an untried offense not alleged in any specification before the commission, the commission shall proceed with the' trial of the offense charged.” R.M.C. 801(d) (emphasis added). Upholding al Bahlul’s conviction on the ground that he could have been tried for and convicted of some other offense would, at the least, raise serious questions as to whether this court has departed from Congress’s express instructions regarding the rights and procedural protections to which alien enemy belligerents are ¿ntitled.
Even if that were not enough, our colleagues’ approach would usurp the fact-finding role of the military commission members, see 10 U.S.C. § 949Í; R.M.C. 502(a)(2) (“The members of a military commission shall determine whether the accused is proved guilty ....”); R.M.C. 921 (addressing the members’ responsibility to determine guilt with respect to each charge and specification), and transgress the statutory limits on this court’s appellate review. Perhaps most importantly, this court’s authority under the MCA is limited to “approving]” a finding of guilty or “affirm[ing] ... so much of the finding as includes a lesser included offense.” 10 U.S.C. § 950a; see id. § 950g. The offenses our colleagues glimpse in the record are neither the charged inchoate conspiracy nor lesser-included offenses of that' crime. See Kelly v. United States, 370 F.2d 227, 228 (D.C. Cir. 1966); Fed. R. Crim. P. 31(c).
Finally, our colleagues seem to rely on a narrow reading of the 2006 MCA’s conspiracy provision as evidence that the government really obtained a conviction for al Bahlul’s participation in a conspiracy that resulted in completed war crimes, an offense that they believe would be triable in a military commission because it would be akin to holding an individual responsible under international law for completed war crimes on a joint criminal enterprise theory of liability. They believe that the statute’s reference to “victims,” see 10 U.S.C. § 950v(b)(28) (2006), requires that there be a completed law-of-war offense to convict an individual of “conspiracy’ within the meaning of that provision, see Millett Op. at 789; Wilkins Op. at 801. We think it quite unwise to opine on the meaning of *835 the statute’s opaque reference to “victims” without the aid of briefing, especially given that, during its more than four years of litigating this case, the government has never pressed such an interpretation of the statute and has instead repeatedly insisted that the statute criminalizes inchoate conspiracy. Even if our colleagues are correct, that would have no effect on the proper outcome in this case. It would only raise additional questions as to whether al Bah-lul’s trial for the crime of inchoate conspiracy was statutorily authorized. The Article III problem lying at the heart of this case thus cannot be solved by reimagining the statute under which al Bahlul was convicted or the crimes for which he was charged, as doing so only raises other fundamental legal problems.
To be sure, Judge Millett and Judge Wilkins’s approach would allow us to sustain the conviction of a man who—by his own admission—proudly assisted the terrorist group responsible for one of the most terrible attacks ever perpetrated against the United States. But that approach is unavailable to us. The government chose to prosecute al Bahlul in a military commission for the crime of inchoate conspiracy. It also never suggested that this court can uphold al Bahlul’s conviction on the ground that he could have been convicted of other charges—and for good reason. That approach raises serious due process concerns and conflicts with the military-commission procedures Congress requires.
iy.
One may wonder, “why the fuss?” Stern v. Marshall, 564 U.S. 462, 502, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). After all, the government is not seeking to prosecute cyber or drug crimes before military commissions; it is seeking only to prosecute conspiracies to commit recognized war crimes. Can such a modest expansion of military-commission jurisdiction really threaten the Constitution’s separation of powers? As in Stern v. Marshall, “[t]he short but emphatic answer is yes.” Id. “[0]ur Constitution ... commands that the independence of the Judiciary be jealously guarded .... ” Northern Pipeline, 458 U.S. at 60, 102 S.Ct. 2858 (plurality opinion). The political branches “may no more lawfully chip away at the authority of the Judicial Branch than [they] may eliminate it entirely.” Stern, 564 U.S. at 503, 131 S.Ct. 2594. And “[although it may be that it is the obnoxious thing in its mildest and least repulsive form, we cannot overlook the intrusion: illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.” Id. (internal quotation marks omitted).
Here, it is easy to see how allowing the political branches to stretch Article Ill’s exception for law-of-war military commissions to encompass inchoate conspiracy charges could represent just the first step toward a much greater usurpation of the judiciary’s domain. Against the backdrop of the war on terror, in which many of the traditional constraints on the use of law-of-war military commissions are disappearing, the government articulates a breathtakingly expansive view of the political branches’ authority to subject non-service-members to military trial and punishment. Indeed, it admits only two constitutional constraints on its power to try individuals in law-of-war military commissions: the charges must allege (1) that'the individuals are “enemy belligerents” who (2) engaged in proscribed conduct “in the context of and associated with hostilities.” Oral Arg. Tr. 37-38 (Dec. 1, 2015).
Critically, the government’s suggestion that the defendant’s status as an enemy belligerent in the context of hostilities suffices to subject him to trial by military *836 commission .ignores the Supreme Court’s focus on the offenses triable to law-of-war military commissions, in addition to the status of the offenders. Thus the Court has focused on “the question whether it is within the.constitutional power of the national government to place petitioners upon trial before a military commission for the offenses with which they are charged.” Quirin, 317 U.S. at 29, 63 S.Ct. 2 (emphasis added). In Quinn, the Court “assume[d] that there are acts” that could not be tried, by military commission “because they are of that class of offenses constitutionally triable only by a jury.” Id. (emphases added). So, too, in Yamashita. 327 U.S. at 8, 66 S.Ct. 340. And in Hamdan, the Court explained that the status of the offender (being a member of a foreign armed force) and the nature of the offense were both necessary conditions for the exercise of jurisdiction by a law-of-war military commission. See Hamdan, 648 U.S. at 597-98, 126 S.Ct. 2749 (plurality opinion) (citing WinthRop, Militaey Law, supra, at 836-39); accord id. at 683, 126 S.Ct. 2749 (Thomas, J., dissenting).
But putting that aside, the extent to which the government’s proposed limits have any force.is far from clear. What does it mean, for instance, for an individual to have committed an offense in the context of hostilities? The answer is uncertain, both as a temporal and geographic matter. We would be willing to wager that if you asked Americans when the United States’ “war” with al Qaeda began, most would say September 11, 2001. Even executive branch, officials often cite that date as the beginning of hostilities against al Qaeda and its affiliates. For example, for certain naturalization purposes, the President “designate^] as a period in which the Armed Forces of the United States were engaged in armed conflict with a hostile foreign force the period beginning on September 11, 2001.” E.O. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002); see Memorandum for the Attorney General, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, Re: Determination of Enemy Belligerency and Military Detention (June 8, 2002), available at 2002 WL 34482990, at *7 (“[T]he September 11, 2001 attacks on the' World Trade Center and the Pentagon began an international armed conflict between the United States and the al Qaeda terrorist organization.”). But in a pending military-commission case, the government seeks to hold an alleged member of al Qaeda responsible for a failed attack on a U.S. vessel that occurred in January 2000. It takes the position in that case that the United States’ war with al Qaeda goes back “to at least 1998,” and it appears to believe that the conflict may date as far back as 1992. See Brief for the United States 5, 41, United States v. Al-Nashiri, Nos. 15-5020 & 15-1023 (D.C. Cir. Dec. 28, 2015). But see United States v. Al-Nashiri, — F.3d - (D.C. Cir. 2016) (recognizing as unsettled for purposes of mandamus when hostilities began against Al Qaeda).
If the government’s view in this case that military commission jurisdiction is limited only by Congress’ war powers were to prevail, Congress and the President could authorize military prosecutions in many situations that we traditionally think of as within the exclusive province of domestic law enforcement agencies and civilian courts. Suppose, for instance, that the FBI launches an investigation into three lawful permanent residents who have lived in the United States since early childhood. Searching an apartment in Virginia that the three share, it discovers pipe bombs, al Qaeda propaganda, and a map of the Washington, D.C. metro system. The government arrests the three and wishes to prosecute them for conspiracy to kill innocent civilians. Under the government’s view of things, the Constitution would pose no bar to transferring the individuals into *837 military custody and prosecuting them before a military commission. In fact, when presented with this hypothetical at oral argument, government counsel conceded that these facts “might well be enough” to try the individuals in a military tribunal. Oral Arg. Tr. 51-53 (Dec. 1, 2015); see also Kavanaugh Op. at 773-74. This is a dangerous suggestion to say the least. Cf Reid, 354 U.S. at 23-24, 77 S.Ct. 1222 (plurality opinion) (“The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds.”).
But the government’s position gets more dangerous still. Now suppose that the three are U.S. citizens. Could the government do an end run around Article III solely because they had some connection to the “war” on terrorism? It would seem so. See Quirin, 317 U.S. at 37-38, 63 S.Ct. 2 (holding that a saboteur’s U.S. citizenship was irrelevant to a commission’s authority to try him for law-of-war offenses). What if the FBI instead discovered that the three U.S. citizens sent $200 to the humanitarian wing of an organization that the United States designated a foreign terrorist organization, earmarked for training in human-rights advocacy that the donors hope will turn the organization away from terrorist activities? Could the three be shipped off to a military base and tried for material support for terrorism—an offense unrecognized under international law but made punishable under the Military Commissions Act? 10 U.S.C. § 950t(25); cf. Holder v. Humanitarian Law Project, 561 U.S. 1, 7-11, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). The government seems to think so.
According to Judge Kavanaugh’s opinion, the court need not concern itself with the limits (or lack thereof) on the political branches’ authority to make conduct punishable by military commission because whatever those limits might be, the punishment of conspiracies to commit war crimes certainly falls within them. See Ka-vanaugh Op. at 771, But if international law does not mark the boundaries between civilian and military jurisdiction, what does? On this, our colleagues are silent. Based on the principles articulated by the government and embraced in Judge Kava-naugh’s opinion, however, it would seem that Congress and the President could vest military commissions with authority to try enemy belligerents for almost any crime so long as it related in some way to “hostilities.” Id. at 770-71. Especially in this new era of “war” against difficult-to-identify enemies on difficult-to-identify “battlefields,” such positions would appear to leave few, if any, enforceable limits on the political branches’ authority to avoid Article III courts and prosecute individuals in military commissions. Thus, although allowing military commissions to take cognizance of inchoate conspiracy charges might seem to some a small and harmless encroachment on the judiciary’s domain, it could very well open the door to much broader intrusions. Any such intrusion would be all the more pernicious here and corrosive of Article III given that, in this case, the government has made no effort to demonstrate the “military necessity” that has traditionally been a prerequisite to resort to military commissions. Hamdan, 548 U.S. at 590, 126 S.Ct. 2749; see also id. at 598-99, 126 S.Ct. 2749 (plurality opinion); id. at 646, 126 S.Ct. 2749 (Kennedy, J., concurring). To accept the government’s position would embed the use of military commissions “more deeply in our law and thinking,” ready to be “expand[ed] ... to new purposes.” Korematsu v. United States, 323 U.S. 214, 246, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Jackson, J. dissenting). A majority of this court declines today to deal any such “blow to liberty.” Id.
[[Image here]]
*838 Before concluding, we think it worth' underscoring the result of today’s decision. Eight of the nine judges deciding this appeal believe that the question lying at the heart of it, i.e., whether Congress can lawfully vest military commissions with jurisdiction over the crime of inchoate conspiracy, is deserving of de novo review. Only four of those considering the question de novo answer it in the affirmative. Accordingly, the majority of judges declines to endorse the government’s view of the Constitution. Today’s decision thus provides no precedential value for the government’s efforts to divert the trial of conspiracy or any other purely domestic crime to law-of-war military commissions.
We, for the reasons discussed, see no lawful basis for the government’s claimed power. Whatever deference the judiciary may owe to the political branches in matters of national security and defense, it is not absolute. Far from it, it is the duty of the courts “in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty.” Quirin, 317 U.S. at 19, 63 S.Ct. 2. And although the government might well be entitled to detain al Bahlul as an enemy belligerent, see Hamdi, 542 U.S. at 518-24, 124 S.Ct. 2633 (plurality opinion), it does not have the “power to switch' the Constitution on and off at will,” Boumediene, 553 U.S. at 766, 128 S.Ct. 2229. Its prosecution of al Bahlul in a military commission for conspiracy to violate the laws of war exceeded the scope of Article Ill’s exception for law-of-war military commissions and, as a result, violated Article III. Accordingly, we would vacate his conspiracy conviction.